IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| KENNETH S. GROSSMAN, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>REGIONAL HEALTH PROPERTIES, INC., BRENT S. MORRISON, KENNETH W. TAYLOR, and DAVID A. TENWICK,<br><br>Defendants. | Civil Action No. _____<br><br>CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff, Kenneth S. Grossman ("Plaintiff"), by and through his attorneys, alleges the following on information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge.

**NATURE OF THE ACTION**

1.      This action stems from a proposed transaction (the "Proposed Transaction" or "Merger") first announced on January 6, 2025, pursuant to which Regional Health Properties, Inc. ("Regional" or the "Company") would enter into an all-stock merger transaction with SunLink Health Systems, Inc. ("SunLink").

2.      Specifically, on or about January 6, 2025, Regional's Board of Directors (the "Board" or the "Individual Defendants") caused the Company to enter

into an Agreement and Plan of Merger (the "Merger Agreement") with SunLink. Pursuant to the terms of the Merger Agreement, "SunLink will merge with and into Regional . . . in exchange for the issuance of an aggregate of 1,410,000 shares of Regional common stock and 1,410,000 shares of Regional's newly-authorized Series D 8% Cumulative Convertible Redeemable Preferred Stock with a liquidation preference of $10 per share."   Regional's stock price the trading day before the announcement was $1.55 per share.   Since then, Regional's stock price has consistently traded at or below $2.50 per share.

3.       On April 15, 2025, the Company and SunLink jointly announced that they had entered into an amended and restated agreement and plan of merger.  Under the terms of the agreement, each five shares of SunLink common stock issued and outstanding immediately prior to the effective time (other than excluded shares) will be converted into the right to receive (i) 1.1330 validly issued, fully paid and nonassessable shares of Regional common stock in an aggregate amount of 1,595,401 Regional shares and (ii) one validly issued, fully paid and nonassessable share of Regional Series D8% Cumulative Convertible Redeemable Participating Preferred Shares (the "Regional Series D Preferred Stock") with an initial liquidation preference of $12.50 per share. preferred stock, in an aggregate amount, subject to adjustment, of 1,408,121 of such shares. Also, 100,000 Regional common shares will be issued to Robert Thornton, SunLink's current Chief Executive Officer,

pursuant to an employment agreement to be entered into between Thornton and Regional at the closing of the merger.

4.      On or about June 24 and 25, 2025, Defendants (as defined below) filed the definitive Registration Statement and Joint Proxy Statement/Prospectus with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction (the "Proxy Statement"), which, among other things, set July 29, 2025, as the date for a Special Meeting of the Company's shareholders, at which, among other things, they will vote for or against the Proposed Transaction.  As described herein, the Proxy Statement omits certain material information with respect to the Proposed Transaction, which renders it false and misleading, in violation of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 140.14a-9 ("Rule 14a-9") promulgated thereunder, including undisclosed proposals to acquire the Company at $4.00 per share and $4.25 per share, as described more fully below.

5.      Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from Defendants' wrongdoing described herein.

**JURISDICTION AND VENUE**

6.    This Court has subject matter jurisdiction over all claims asserted herein pursuant to Section 27 of the Exchange Act, 15 U.S.C § 78aa, and 28 U.S.C. § 1331, as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

7.    This Court has personal jurisdiction over all of the Defendants because each is either a corporation that conducts business in, solicits shareholders in, and/or maintains operations within this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

8.    Venue is proper under 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

**PARTIES**

9.    Plaintiff is, and has been at all times relevant hereto, the owner of Regional common and preferred shares.

10.    Defendant Regional, headquartered in Atlanta, Georgia and incorporated in Georgia, is a self-managed healthcare real estate investment company that invests primarily in real estate purposed for senior living and long-term care.

11.    Defendant Brent S. Morrison ("Morrison") has served as the Company's Chief Executive Officer and President since March 2019, Corporate Secretary since December 2022, a director since October 2014 and Chairman of the Board since January 2023. He also served as the Company's Interim Chief Executive Officer and Interim President from October 2017 to March 2019.

12.    Defendant Kenneth W. Taylor ("Taylor") has served as a director since February 2018.

13.    Defendant David A. Tenwick ("Tenwick") is the founder of the Company and has served as a director since the founding in August 1991. Mr. Tenwick also served as Chairman of the Board from the founding until March 2015 and as the Company's Interim Chief Executive Officer and President from June 1, 2014, to November 1, 2014.

14.    Defendants Morrison, Taylor, and Tenwick are collectively referred to herein as the "Individual Defendants."

15.    The Individual Defendants and Regional are referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

16.    According to the Company's SEC filings, Regional Health is a self-managed real estate investment company that invests primarily in real estate purposed for long-term care and senior housing.  The Company operates through

two reportable segments: (i) real estate segment, which consists of owning and leasing/subleasing healthcare facilities, predominantly skilled nursing facilities and assisted living facilities, to third-party tenants, which in turn operate the facilities; and (ii) healthcare services segment, which consists of operating healthcare facilities.

17.     On June 18, 2025, Charles Frischer, a long-time holder of Regional's common shares (7.4%) and Series B Preferred shares (21.3%) filed an amended 13D that said that he had sent a letter to the Board of Directors of Regional (the "Board"), in response to an offer to purchase Regional's assets that, according to Frischer, had been submitted to the Board on May 6, 2025 (the "First Purchase Offer").  In his letter, Frischer expressed his displeasure that Regional had not engaged with the potential buyer regarding the First Purchase Offer and urged the Board to begin negotiations relating to the First Purchase Offer, as the offer, according to Frischer, reflected a 99% premium to the Common Share price.  Frischer attached his letter to the amended 13D.

18.     The body of the letter states as follows:

I received a copy of an offer to purchase assets of Regional Health Properties, Inc. on May 14th. The offer was submitted to your Board on May 6, 2025. The purchaser is offering $4.00 per share in cash for all the common shares of Regional. Based upon my limited due diligence of the buyer, they seem incredibly credible. In real estate parlance, the buyer seems Ready, Willing and Able to transact.

The purchase offer describes how the buyer has significant financial resources and is prepared to move forward immediately on due diligence, with an purchase price which is a 99% premium to the purchase price as of May 15th. Let that sink in, a 99% premium to the current price of common stock and this is an all-cash transaction. The buyer is also a very experienced owner of skilled nursing facilities throughout the country.

The potential buyer has informed me that Brent Morrison, our CEO, is not willing to engage in negotiations on this offer and has rebuffed virtually all efforts to explore this very strong offer.

At this point the potential buyer has not even been provided with a standard confirmatory diligence package, which is necessary to facilitate this offer and requires no commitment or expenditure by the company.

It has now been over 40 days since you have received this offer and you have not moved forward with the potential acquirers or told your shareholders of this highly qualified offer.

The purchaser is willing to put up $1 million dollars into escrow upon the execution of a purchase contract and has requested a very standard 60-day due diligence period. The closing is proposed to be approximately 45 days after all licensure and regulatory approvals have been received.

Also, I understand that this offer was not solicited in anyway by Regional and therefore is not in violation of any of terms of the existing agreement to merge the company with Sunlink Health Systems. The merger with Sunlink makes no business sense to me. The benefits of the merger are entirely unclear to me and as Regional's largest common and preferred shareholder, the merger appears to offer no credible benefits to shareholders. I currently own 7.4% of the common shares and 21.3% of the class B Preferred Shares.

I think we are quite fortunate that a buyer is willing to offer a price reflecting a 99% premium on the common share price, on an all-cash basis, and is not a merger with Sunlink, which I believe is of dubious value to Regional common shareholders.

While there are always things to be negotiated with a potential buyer, I understand that the CEO of Regional is not willing to even discuss the terms and conditions of this offer. The potential buyer has asked that I not publicly disclose their name and since you have a copy of the offer, I am happy to abide by that request.

While I have no agreement either verbally or in writing with the buyer regarding my preferred shares, I believe I would be able to quickly reach an outcome with the buyer to acquire my preferred shares. While I have no agreement with the other preferred shareholders as well, they are a thoughtful group of investors who would likely reach a similar conclusion. This would likely occur during the first week or two of the due diligence period.

This appears to be an excellent offer for the shareholders. I urge you to immediately begin negotiations with this buyer. The shareholders of Regional common deserve your attention to this offer and I trust you will respect your fiduciary responsibility to the shareholders.

19.    Plaintiff also received a copy of the $4.00-per-share First Purchase Offer, dated May 6, 2025, from the potential buyer ("Potential Buyer A").  (A redacted copy of the First Purchase Offer is attached hereto as Exhibit A.)  The actual First Purchase Offer confirms the representations Frischer makes in his June 18, 2025 letter to Regional's Board.

20.    Thus, the First Purchase Offer was from a national, privately held, healthcare real estate investment firm that focuses on healthcare facilities spanning 35 states.  The First Purchase Offer emphasizes that Potential Buyer A is privately owned, "active and aggressive buyers in the space," requires no board approval for entering into transactions, has a reputation for closing its deals with "100% certainty

of execution," and has "a very significant relationship with HUD," obtaining a level of HUD approval "reserved for HUD's largest and most reputable borrowers."

21.    The First Purchase Offer makes clear that Potential Buyer A was prepared to purchase all of the assets owned by Regional, and the proposed $4.00 per-share purchase price is set out unambiguously:

- Purchaser may assume the principal balance of certain mortgage loans of Seller insured by the U.S. Department of Housing and Urban Development ("HUD Loans") elected to be assumed by Purchaser;

- An amount equal to the principal balance of all outstanding mortgage indebtedness of the Seller which is not assumed by Purchaser in an amount not to exceed $51 million less the principal balance of HUD Loans assumed; and

- An amount equal to **$4.00** per share for the Company's common stock outstanding.

22.    In bold print, Potential Buyer A stated:

**Purchaser is prepared to proceed to contract, and Purchaser's counsel shall provide the initial draft of the Transaction Documents within seven (7) days of the mutual execution of this [letter of intent].**

23.    Potential Buyer A provided for an initial $1 million "initial earnest money" payment, a sixty-day due diligence period, and at the completion of the due diligence period, a second $1 million payment.

24.    The First Purchase Offer was signed by the Managing Principal, Co-Founder of Potential Buyer A.

25.    Despite the fact that Regional's stock has sold for significantly less than $4.00 per share for over two years (see stock price chart below), Regional ignored the First Purchase Offer.



26.    After Regional received and ignored the First Purchase Offer, a second potential buyer ("Potential Buyer B") sent Regional an offer to purchase the Company for $4.25 per share (the "Second Purchase Offer). Potential Buyer B, like Potential Buyer A, has a track record of buying and running multiple nursing home

facilities similar to those owned by Regional.  As with the First Purchase Offer, and despite Regional's share price trading below $2.50 per share, Regional ignored Potential Buyer B's $4.25 per share offer.

27.    The Merger Agreement with SunLink sets out, among other things, what is required of Regional if it receives what is termed a "Regional acquisition proposal."  The First and Second Purchase Offers fall squarely within that definition because they are both "offer[s] or proposal[s] from a third person concerning . . . a merger, consolidation, or other business combination transaction" that wasn't solicited by Regional.  According to that section of the Merger Agreement, Regional was permitted to contact Potential Buyer A and B concerning the offers to purchase, but was required to report both offers to SunLink.  Thus, the Proxy describes this portion of the Merger Agreement as follows:

> In connection with the receipt of any Regional acquisition proposal, Regional will:
>
> •    promptly (and in any event within forty-eight (48) hours) notify SunLink in the event that Regional receives any Regional acquisition proposal, which notice shall include the identity of the third person making such Regional acquisition proposal and a copy of such Regional acquisition proposal (or, where such Regional acquisition proposal is not in writing, a detailed summary of the material terms and conditions of such Regional acquisition proposal);
>
> •    promptly (and in any event at least twenty-four (24) hours prior to such provision or engagement) advise SunLink if Regional determines to begin providing information or to engage in discussions or negotiations concerning a Regional acquisition proposal;

- keep SunLink informed on a prompt (and, in any event, within forty-eight (48) hours) basis of the status and material details (including amendments or proposed amendments) of any such Regional acquisition proposal (including providing copies of any written documentation it believes material relating to such Regional acquisition proposal).

28.    Significantly, the Proxy also reaffirms the Board's obligation to determine, "after consultation with outside counsel and its financial advisor," if any Regional acquisition proposal, which would include the First and Second Purchase Offers, constitutes a superior proposal and, if so, whether to change its recommendation.  Thus, the Proxy states:

> If the Regional Board determines in good faith, after consultation with outside counsel and its financial advisor, that such Regional acquisition proposal constitutes a superior Regional proposal, the Regional Board may at any time prior to the time that Regional shareholder approval is obtained effect a Regional change of board recommendation with respect to such superior Regional proposal.

29.    In soliciting shareholder approval for the Proposed Transaction, on or about June 24 and 25, 2025, Defendants caused the issuance of the Proxy Statement, which purports to contain a summary/overview of the Proposed Transaction, but omits certain critical information, rendering portions of the Proxy Statement materially incomplete and/or misleading, in violation of the Securities Exchange Act provisions discussed herein.  As a result, Regional's shareholders lack material information necessary to allow them to make an informed decision concerning whether to vote in favor of the Proposed Transaction.

30.    The Proxy omits the very existence of either the First or the Second Purchase Offer  detailed above, that the Board was contacted with two viable and credible offers to purchase the Company at $4.00 and $4.25 per share—both significant premiums to the Company's stock price—that the Board refused to respond to either offer, the reasons the Board refused to respond to the offers, whether the Board disclosed the offers to SunLink, whether the Board consulted with outside counsel and its financial advisor to determine if either or both of the offers are superior to the Proposed Transaction, and if so what the results were of that consultation and the bases for that determination, and if the $4.00 and/or $4.25 per share offers were determined to be superior offers, whether the Board considered changing its recommendation to approve the Proposed Transaction.

31.    The Proxy describes certain reimbursement provisions of the Merger Agreement that might "discourage a potential third-party acquiror or merger partner that might have an interest in acquiring all or a significant portion" of Regional. Here is the entire section of the Proxy that describes this possible effect of the provision:

> **The merger agreement contains provisions that limit Regional's and SunLink's ability to pursue alternatives to the merger, <u>could discourage a potential acquiror from making a favorable alternative transaction proposal</u> and, in specified circumstances, could require Regional or SunLink to pay a reimbursement fee to the other.**
>
> The merger agreement contains provisions that make it more difficult for Regional and SunLink to engage in any alternative transaction with

a third party. The merger agreement contains certain provisions that restrict the ability of Regional and SunLink to, among other things, solicit or knowingly induce (including by providing any material non-public information concerning such party or any significant subsidiary to any person or group for the purpose of facilitating any proposals or offers relating to any Regional acquisition proposal or SunLink acquisition proposal, as applicable) or knowingly assist any proposal or offer that constitutes or would reasonably be expected to lead to a Regional acquisition proposal or SunLink acquisition proposal, as applicable or engage in any negotiations with respect thereto. For further discussion, see the sections entitled "The Merger Agreement-Additional Agreements-No SunLink solicitation" and "The Merger Agreement-Additional Agreements-No Regional Solicitation."

In some circumstances, upon termination of the merger agreement, Regional or SunLink would be required to reimburse the other for all reasonable out-of-pocket fees and expenses incurred or paid by such party in connection with the negotiation of the merger agreement and the consummation of any of the transactions contemplated by the merger agreement in an amount not to exceed $250,000. For further discussion, see the section entitled "The Merger Agreement-Reimbursement Fee."

***These provisions could discourage a potential third-party acquiror or merger partner that might have an interest in acquiring all or a significant portion of SunLink or Regional*** or pursuing an alternative company transaction from considering or proposing such a transaction, even if it were prepared to pay consideration with a higher per share value than the value proposed to be received in the merger or would result in greater value to the SunLink or Regional shareholders relative to the terms and conditions of the merger agreement. In particular, the reimbursement fee, if applicable, could result in a potential third-party acquiror or merger partner proposing to pay a lower price to the SunLink or Regional shareholders than it might otherwise have proposed to pay absent such a fee.

32.     Contrary to the Proxy's warning that the provisions "could" discourage

a potential third-party acquiror and the clear implication that there were no such

potential third-party acquirors, Defendants were aware of, or became aware of, and had refused to respond to, the First and Second Purchase Offers made by actual, not potential, third-party acquirors. Thus, the omissions in the Proxy concerning the two significant offers render the precise statements above--that certain provisions in the Merger Agreement "***could discourage a potential third-party acquiror or merger partner that might have an interest in acquiring all or a significant portion . . . Regional***"—to be materially false and misleading.

33.    It would certainly be material to Regional's shareholders when voting for or against the Proposed Transaction to know that two alternative viable and credible transactions had been proposed to the Board and ignored, that these two offers were for $4.00 and $4.25 per share--significant premiums to the Company's stock price--whether the Board consulted with its legal and financial advisors to determine whether either or both of the offers is "superior" to the Proposed Transaction and how that determination was made, and whether the Board considered changing its recommendation as to the Proposed Transaction. The omission of this material information will deprive Regional's shareholders of their right to make an informed decision to vote for or against the Proposed Transaction.

## CLASS ACTION ALLEGATIONS

34.    Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Regional (the "Class").

Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

35.     This action is properly maintainable as a class action for the following reasons:

a.     The Class is so numerous that joinder of all members is impracticable.  As of March 25, 2025, there were 2,129,239 shares of Regional common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

b.     Questions of law and fact are common to the Class, including, among others: (i) whether Defendants have violated Sections 14(a) and 20(a) of the Exchange Act in connection with the Proposed Transaction; and (ii) whether Plaintiff and the Class would be irreparably harmed if the Proposed Transaction is consummated as currently contemplated and pursuant to the Registration Statement as currently composed.

c.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

d.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

e.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

f.    A class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

g.    Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, preliminary and final injunctive relief on behalf of the Class as a whole is entirely appropriate.

## CAUSES OF ACTION

### COUNT I
**Claim for Violation of Section 14(a) of the Exchange Act
and Rule 14a-9 Promulgated Thereunder
(Against All Defendants)**

36.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

37.    Section 14(a)(1) of the Exchange Act makes it "unlawful for any person . . . to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

38.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that solicitation communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9(a).

39.     Rule 14a-9 further provides that, "[t]he fact that a proxy statement, form of proxy or other soliciting material has been filed with or examined by the Commission shall not be deemed a finding by the Commission that such material is accurate or complete or not false or misleading, or that the Commission has passed upon the merits of or approved any statement contained therein or any matter to be acted upon by security holders. No representation contrary to the foregoing shall be made." 17 C.F.R. § 240.14a-9(b).

40.     As discussed herein, the Proxy misrepresents and/or omits material facts concerning the Proposed Transaction.

41.     Defendants prepared, reviewed, and caused the filing and dissemination of the false and misleading Proxy to Regional shareholders. In doing so, Defendants knew or recklessly disregarded that the Proxy failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

42.    The omissions and incomplete and misleading statements in the Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote their shares.  In addition, a reasonable investor would view such information as altering the "total mix" of information made available to shareholders.

43.    By virtue of their positions within the Company and/or roles in the process and in the preparation of the Proxy, Defendants were undoubtedly aware of this information and had previously reviewed it.

44.    Regional is deemed liable as a result of the Individual Defendants' negligence and/or recklessness in preparing and reviewing the Proxy.

45.    Defendants knew that Plaintiff and the other public shareholders of the Company would rely upon the Proxy in determining whether to vote for or against the Proposed Transaction.

46.    As a direct and proximate result of Defendants' unlawful course of conduct in violation of Section 14(a) of the Exchange Act and Rule 14d-9, absent injunctive relief from the Court, Plaintiff and the other public shareholders of the Company will suffer irreparable injury by being denied the opportunity to make an informed decision as to whether to vote in favor of the Proposed Transaction.

47.    Plaintiff has no adequate remedy at law.

<u>COUNT II</u>
**Claim for Violations of Section 20(a) of the Exchange Act
(Against the Individual Defendants)**

48.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

49.     The Individual Defendants acted as controlling persons of Regional within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Regional, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

50.     Each of the Individual Defendants were provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

51.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular

transactions giving rise to the securities violations alleged herein, and exercised the same.  The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger.  They were thus directly connected with and involved in the making of the Proxy.

52.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the Exchange Act and Rule 14d-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons and the acts described herein, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

53.    As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

54.    Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class Representative and Plaintiff's counsel as Class Counsel;

B.      Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

C.      Directing the Individual Defendants to cause the dissemination of a registration statement or proxy that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.      Directing Defendants to account to Plaintiff for the damages sustained because of the wrongs complained of herein;

E.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted this 11th day of July, 2025.

*/s/ David A. Bain*
David A. Bain
Georgia Bar No. 032449
LAW OFFICES OF DAVID A. BAIN, LLC
1230 Peachtree Street, NE, Suite 1050
Atlanta, GA 30309
Tel: (404) 724-9990
Fax: (404) 724-9986
Email: dbain@bain-law.com

*Counsel for Plaintiff*
*Kenneth S. Grossman*

**OF COUNSEL:**

**WOLF POPPER LLP**
Carl L. Stine (motion for *pro hac vice* forthcoming)
845 Third Avenue
New York, New York 10022
Tel.:  212-759-4600
Fax:  212-486-2093
Email: cstine@wolfpopper.com